## Case No. 16,329.

### UNITED STATES v. SMITH.

[4 Cranch, C. C. 659.] [1]

Circuit Court, District of Columbia. Nov. Term, 1835.

GAMING—KEEPING COMMON GAMING TABLE.

Neither a single act of play at a gaming-table, called a sweat-cloth, at the races, nor even a single day's use of it on the race-field, is a keeping of a common gaming-table, within the penitentiary act for the District of Columbia [4 Stat. 448].

This was an indictment [against Henry Smith] for keeping a certain common gaming-table called a sweat-cloth, against the form of the penitentiary act for the District of Columbia, of the 2d of March, 1831, §§ 1, 12.

The motion in arrest of judgment having, on the 11th instant, been overruled [Case No. 16,328], the defendant's counsel moved for a new trial, on the ground that the exhibition and use of a gaming-table called a sweat-cloth, for a single day on the race-ground, during the races, was not such a keeping of a common gaming-table as was within the meaning of the penitentiary act; the word "keeping" not being satisfied by proof of a single act of play at the table, nor even by a single day's use of it.

After argument, THE COURT (MORSELL, Circuit Judge, contra) granted a new trial, on the ground suggested by the defendant's counsel.

CRANCH, Chief Judge. The defendant has been found guilty of keeping a certain common gaming-table, called a sweat-cloth. A motion for a new trial is made by the counsel of the defendant, because the witnesses only proved that it was exhibited and used one day during the races; which they contend does not amount to the offence of keeping a gaming-table within the meaning of the statute. The word "keeping," certainly, when applied to time, implies duration. Standing alone without limitation, either by express words, or by the nature of the act or thing which it governs, it implies indefinite duration; as when I say, take this book and keep it; keep at work; keep the mill going. But the duration may be limited to a single day, or

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

hour, or minute, and still it is "keeping." So it may be limited or extended by the nature of the subject to which it is applied. That subject may consist of a succession of acts. Thus we say, "he keeps a ferry;" but a single act of carrying a man across a river in a boat, is not keeping a ferry;—"keeps a tavern;" but a single act of lodging a traveller, is not keeping a tavern. So we say, "he keeps a disorderly house;" but a single instance of disorder in the house, is not the keeping of a disorderly house. Many other instances may be cited, in which the word keeping implies a repetition, or succession of' similar acts. If the thing to be kept, is itself, temporary, the duration intended by the word "keeping," will be temporary, also. If, therefore, congress had prohibited the keeping of a sweat-cloth at the races, the word "keeping" might, perhaps, have been satisfied by one day's keeping. But if congress had been asked whether they intended to punish by imprisonment and labor in the penitentiary, any person who should exhibit and keep a sweat-cloth for a single day at the races, I think they would have said that they did not; that it was not the kind of keeping which they contemplated. I think, therefore, that a new trial should be granted.

THRUSTON, Circuit Judge. This is an indictment for keeping a common gaming-table called a sweat-cloth. A motion is made for a new trial, grounded on the legal sense of the participle keeping, as intended in the law; and on the construction of which the motion must be allowed or not. Admitting the verb keep, as used in the law, or rather the participle of that verb, namely, keeping, can be strained to the sense contended for; that it may imply a momentary, or a few minutes', or an hour's, keeping a sweat-cloth, (though the testimony, as far as I recollect it, only proved upon the traverser one single instance of his playing at such table,) yet surely it does not become the court, nor is it consistent with the established principle of construction, nor the avowed humanity of the law, to be astute in searching for a meaning of the word to suit the occasion, against the undoubted sense in which the word is used in common parlance, as I have endeavored to show by numerous instances cited by me in my former remarks, which might be swelled to an indefinite extent, without a single example that could be adduced to the contrary; take yet another instance or two. We say, "this is a good keeping apple;" "will this meat keep?" yet everybody knows that neither the meat nor the apple will keep but a limited time, although they will keep for a time implying duration beyond a day, or week, or two weeks; the apple will only last sound for a few months, and the meat, (if not in a vessel hermetically sealed,) but a few years; but in both cases, considerable duration is implied, ex vi termini; where shall we look for authorities to settle the meaning of this most significant term, upon the true construction of which depends the fate of several unhappy beings now in jail? Shall we seek them in common usage? That is in favor of the meaning I contend for. Shall we go to dictionaries, to the best expositions of the term keeping, by the best lexicographers? They support my definition. Shall we seek for illustrations from parallel and corresponding words in other languages? They sanction the definition as I have given it, namely: take the Latin language, the verb "sustentare" is the nearest, nay, the true corresponding word in that language to the verb "keep." This word is translated by Ainsworth, the highest authority, by the words "to sustain" or "maintain"; and what English scholar will give a meaning to those words implying only a moment's, or even an hour's duration? Take an equivalent and corresponding French word, namely, "entretenir"; will any French scholar pretend that this word has so limited a meaning?

Let us then look into the policy of the law, as far as we can gather it from known facts within the knowledge of everybody; and as the statute has no preamble, I know not where else we can search for the intention of the legislature, except from considering the circumstances which it is probable led to its enactment. Who believes that congress either knew or thought of those petty ephemeral tables on race-grounds, which, at most, could only last during the races, and for aught that appeared in evidence on the trial, did not, in the case before us, continue to be played at beyond a few minutes? Congress has tolerated the principal vice, horse-racing. It is hardly presumable they would have left this higher quarry, and struck at the humbler sweat-cloth, a mere incident to the principal, and as certain to follow it as any incident to follow its principal. Had they designed to strike at them, they would have designated them by a more special description, and more congenial terms; they saw, under their very noses, the established and permanent faro-banks in this city, continuing during the session, and some of them, as I have heard, and believed, for years; the fixed, well-known, and dangerous places of resort, kept as permanently and notoriously as Gadsby's Hotel; established places of seduction to the young and the unwary, and productive of every evil; of loss of fortune, of the earnings of tradesmen, shopkeepers, and, perhaps, laborers, and driving on desperation to seek the means of indulging the most absorbing of all passions, gambling; by fraud, larceny, or robbery, and terminating an unsuccessful career by suicide. These are the formidable results of those great establishments, of those hells, as they are justly called; and which congress, by fearful penalties endeavored, and I believe designed to put down.

No such consequences can result from sweat-cloths; they are among those mushroom extravagancies of the race-field, springing up with the races and ending with them, and no more heard of till the return of that annual

jubilee, which has been in use and practice, without let or molestation till now, for an indefinite period, so as to become almost sanctioned by immemorial usage, unnoticed by the laws of Maryland, whose numerous race-fields, dispersed through the country, with all their concomitants of sweat-cloths, and other similar irregularities, have been kept up, and annually, and even semiannually used and indulged in for a time, the commencement of which is at this day unknown,—beyond the memory of man. Do you believe that congress meant, under this short, but sure magic word "keeping," for magic it is indeed, if it has such wonderful efficacy to put down, so suddenly, this ancient usage, "more honored," it is true, "in the breach than the observance," this petty gambling, confined to the poor, the ignorant, during a few days, at most, of an annual celebration; when, from long habit, and the indulgence of the laws, until now, a general relaxation of manners have been permitted and tolerated during such celebrations; like the Saturnalia at Rome, where the laws were almost suspended, for, as well as I remember, three days in the year. To return to the word "keeping." If the word implies exclusively, when unattended with other restraining adjuncts or explanatory words, what I have stated above, if it was never known, in common use, to have any other meaning, nor, according to the expositions of the best dictionaries, illustrated by parallel and corresponding words in other languages, no other meaning can be ascribed to it, shall we strain and force it to a meaning thus denied it by common use, and such authorities, in order to convict the prisoner, and send him to the wretched confinement of the penitentiary, because, to our more cultivated minds and more improved moral sense, he has indulged in practices which shock our feelings? It is against every principle of construction to construe a criminal law not only liberally, but with unprecedented license against the accused; but, on the contrary, if the words, so far from having any force against him, are entirely in his favor, will even admit of a construction to save him, by any reasonable intendment, it is our duty, and comports with the known humanity of the law, to give them that construction. Shall we, I say, arbitrarily strain the word to a sense not justified by common use, nor the most authorized expositions of it by the best expounders, and illustrations drawn from other languages, in order to take in this case, because we think he deserves punishment? He is a profligate fellow, and therefore the word means so and so, and he deserves to be punished, although no instance of such meaning can be found, of the word, unless it be limited and restricted to such meaning, by other words or adjuncts, clearly abridging the known and acknowledged sense of it. For example, we say, "he kept his bed a whole day;" "will you keep my place for me until I return?" in the first case, limiting the duration of the keeping by express words, to a day; and in the latter, by like words or adjuncts, to the time of the return; but the law says, whoever shall "keep a faro-bank or gaming-table," without any words of limitation. Now why should we be thus astute in seeking to bring the traverser within the formidable penalty of the statute, by resorting to an unusual, forced, and unauthorized construction of a single term or expression, on the true import of which his fate hangs? Why should we do this thing? Is it because these poor creatures, born and raised in poverty, ignorance, and darkness, and without any chance or means of moral culture, have done what shocks our more cultivated minds, or our religious or moral sentiments? Are we reformers, or are we judges, to administer the law as it is, and not as we think it ought to be, to the poor and rich with equal hand, and leave reformation to be worked out where alone it can and ought to be, by the wisdom of the laws, or the spread of knowledge and diffusion of learning, or by the influence of moral and religious instruction, by the ministers of religion?